# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TYLER RYAN SCOTT,
        *Plaintiff*,

    v.

NANCY A. BERRYHILL,
        *Deputy Commissioner for Operations,*
        *Social Security Administration,*
        *Defendant*.

## RULING ON CROSS MOTIONS TO REMAND AND AFFIRM DECISION
## OF THE COMMISSIONER OF SOCIAL SECURITY

Plaintiff Tyler Scott asserts that he is disabled and unable to work due to a number of

mental disorders. He has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a

final decision of defendant Commissioner of Social Security, who denied plaintiff's claim for

disability insurance benefits. For the reasons explained below, I will deny plaintiff's motion for

judgment on the pleadings (Doc. #13), which I construe as a motion to reverse or remand the

decision of the Commissioner, and I will grant the Commissioner's motion to affirm the decision

of the Commissioner (Doc. #23).[1]

### BACKGROUND

The Court refers to the transcripts provided by the Commissioner. *See* Doc. #11-1

through Doc. #11-8. Plaintiff filed an application for disability insurance benefits on October 4,

2013, alleging a disability onset date of June 1, 2013. Plaintiff was 23 years old at the time of his

---

[1] The Social Security Administration does not have a Commissioner, and since November 2017 defendant Deputy Commissioner for Operations Nancy A. Berryhill has been serving in that role. *See* Social Security, Nancy A. Berryhill biography, *available at* https://www.ssa.gov/agency/commissioner.html (last accessed March 31, 2018). For the sake of simplicity, I will refer to the defendant simply as "the Commissioner" in this ruling.

application. Plaintiff's claim was denied on December 12, 2013, and again upon reconsideration on April 2, 2014. Plaintiff then filed a written demand for a hearing.

Plaintiff appeared and testified at a hearing before Administrative Law Judge (ALJ) Robert A. DiBiccaro on April 30, 2015. Plaintiff was represented by counsel. On July 27, 2015, the ALJ issued a decision concluding that plaintiff was not disabled within the meaning of the Social Security Act. *See* Doc. #11-3 at 38–49. After the Appeals Council denied plaintiff's request for review, plaintiff filed this federal action.

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [a claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [a claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(a)–(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

To evaluate a claimant's disability, and to determine whether he qualifies for benefits, the agency engages in the following five-step process:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers

whether the claimant has a "severe impairment" that significantly limits [his] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed [in the so-called "Listings"] in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [he] has the residual functional capacity to perform [his] past work. Finally, if the claimant is unable to perform [his] past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122–23 (2d Cir. 2012) (alteration in original) (citation omitted); *see also* 20 C.F.R. § 416.920(a)(4)(i)-(v). In applying this framework, an ALJ may find a claimant to be disabled or not disabled at a particular step and may make a decision without proceeding to the next step. *See* 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proving the case at Steps One through Four; at Step Five, the burden shifts to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

      The ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act. At Step One, the ALJ determined that plaintiff last met the insured status requirement of the Social Security Act on June 30, 2013. Doc. #11-3 at 41. Plaintiff had not engaged in substantial gainful activity since June 1, 2013, the date of the alleged onset of his disability. *Id.* at 42. At Step Two, the ALJ found that plaintiff suffered from the following severe impairments: "psychotic disorder, not otherwise specified, obsessive compulsive disorder (OCD), unspecified schizophrenia, and bipolar disorder, unspecified." *Ibid.*

At Step Three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 25. *Ibid.*

At Step Four, the ALJ found that, through the date of last insured, plaintiff "had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could have occasional contact with supervisors, co-workers, and the public," and he "could understand and remember simple instructions and carry out routine, repetitive tasks." *Id.* at 44. In formulating the residual functional capacity (RFC), the ALJ accorded "great weight" to the state agency reviewing consultants' psychological evaluations and "significant weight" to their mental assessments. *Id.* at 47.

The ALJ accorded the multiple opinions of plaintiff's treating physician, Christine Naungayan, M.D., varying degrees of weight. The ALJ gave Dr. Naungayan's October 2013 and April 2014 opinions only "some weight," because plaintiff subsequently showed significant improvement after both these dates with treatment. *Id.* at 47, 48. To the extent that the April 2014 opinion touched upon plaintiff's stress tolerance and attendance estimates, the ALJ gave Dr. Naungayan's opinion "little weight" because of lack of support in the doctor's treatment notes. *Id.* at 48. The ALJ concluded that Dr. Naungayan's opinion of April 2015 should be given "no weight," because this opinion was not consistent with the doctor's treatment notes. *Ibid.*

As to plaintiff's credibility, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." *Id.* at 45. The ALJ gave the testimony of plaintiff's step-father, who also testified at the hearing, "little weight." *Id.* at 48. Also at Step Four, the ALJ concluded that there was insufficient evidence to

make a determination whether plaintiff could perform his past relevant work as a machine stocker. *Ibid.*

At Step Five, after considering plaintiff's age, education, work experience, and RFC, the ALJ concluded that, through the date of last insured, there were jobs that plaintiff could perform that existed in significant numbers in the national economy. *Id.* at 49. In reaching this conclusion, the ALJ relied on the Medical-Vocational Guidelines ("Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2. *Ibid.* The ALJ also gave significant weight to the state agency finding that plaintiff is capable of performing work as a surveillance system monitor, type-copy examiner, and printed circuit layout taper. *Ibid.* Because plaintiff's nonexertional limitations "had little or no effect on the occupational base of unskilled work at all exertional levels," the ALJ believed it appropriate to rely on the Grids in making his Step Five finding. *Ibid.* The ALJ ultimately held that plaintiff was not disabled within the meaning of the Social Security Act. *Id.* at 50.

On December 15, 2016, the Appeals Council denied plaintiff's request for review. *Id.* at 2. Plaintiff submitted additional evidence for the Appeals Council to consider, but the Appeals Council declined to consider the evidence because it did not meet the criteria for consideration set forth in 20 C.F.R. § 405.401(c). Plaintiff then timely filed this case on February 13, 2017.

## DISCUSSION

The Court may ordinarily "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, this Court must uphold the Commissioner's decision if it is supported by substantial evidence and even if this Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart,* 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Plaintiff advances four claims of error. First, plaintiff claims that the ALJ failed to properly weigh the medical opinion evidence. Second, plaintiff claims that the ALJ failed to make proper credibility determinations as to plaintiff and his step-father. Third, plaintiff claims the Commissioner failed to sustain the burden to show that there was a significant number of jobs that plaintiff could perform. Fourth, plaintiff claims that the Appeals Council improperly refused to consider new evidence. I will address each argument in turn.

### Weight of Medical Opinion and the Treating Physician Rule

The treating physician rule requires that "the opinion of a [plaintiff's] treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128; 20 C.F.R. § 404.1527(c)(2).

The ALJ properly declined to accord Dr. Naungayan's opinions controlling weight on the ground that her opinions regarding plaintiff's limitations were not consistent with other substantial evidence in the record, including her own notes. Dr. Naungayan's notes reveal considerable improvement after plaintiff was released from the hospital in July 2013. She consistently reported that he was "doing well," observing during clinical visits that he was "pleasant, calm. Affect appropriate, fair range. TP logical, goal-directed in brief, discrete responses." Doc. # 11-8 at 54, 55, 60, 121, 135, 132, 133, 135, 136 (notes throughout 2014 and

early 2015). Additionally, mental status evaluations ("MSEs") revealed largely normal findings, *i.e.*, normal cognitive function, oriented to time, place and person, logical and organized executive function, normal appearance, normal grooming, pleased, euthymic, and calm mood, full-ranging, normal affect congruent with mood, unimpaired thought process, unimpaired thought content, an no suicidal or homicidal ideation. *Id.* at 119, 122, 124, 126, 128, 130 (notes from 10/22/2014 to 3/16/2015).

On January 19, 2014, about seven and one-half months after the alleged onset date, plaintiff's step-father attended one of plaintiff's clinical visits to Dr. Naungayan. Plaintiff's step-father inquired about plaintiff finding part-time work and his ability to drive. Dr. Naungayan noted that both "seem[ed] to be fine as [plaintiff] doing well, stable." Doc. # 11-8 at 54.

Dr. Naungayan's opinions are also inconsistent with the observations of Ashley Koven, LCSW during group therapy sessions. At the first session on March 14, 2014, plaintiff introduced himself, participated in formulating group rules, engaged in the group activity, discussed his issues, and demonstrated understanding and empathy, all without any noted distress. *Id.* at 56. He continued to attend with little trouble. *See id.* at 57-59. On occasion, his engagement with the group was somewhat limited, *id.* at 61-62, but he was otherwise not distressed by the experience. *Ibid.*

To be sure, there appears to have been some sort of episode in August 2014, but the crisis center declined to take any further action, *id.* at 100, despite the fact the MSE revealed that plaintiff was malodorous, thought-blocking, had loose associations in his thought process, and delusions. *Id.* at 101. Dr. Naungayan's notes recite plaintiff's view that the incident was a "misunderstanding" that occurred when plaintiff's mother woke him from a nap. *Id.* at 134. When plaintiff visited Dr. Naungayan after the incident plaintiff had an unremarkable MSE, *i.e.*,

"pleasant, calm. Affect appropriate, fair range. TP logical, goal-directed in brief, discrete responses." *Ibid.* "Pt stated that he feels good overall, still functioning at home, appears to be at his baseline in this meeting." *Ibid.*

There is evidence in the record of negative symptomology. *See, e.g.*, Doc. #11-8 at 49 (initial intake on 9/30/13 noting odd affect and poverty of thought and speech); *id.* at 100-01 (crisis center evaluation on 8/15/14 noting plaintiff was delusional, thought-blocking, had loose associations, and was malodorous after a report from his mother that he made a menacing remark). Many of Dr. Naungayan's clinical notes observe that plaintiff was "still with some negative symptoms of schizophrenia," but was functioning at home at his baseline. *See e.g.*, *id.* at 53-55, 60, 121, 132, 134, 135.

Still, the frequent and persistent otherwise normal MSEs and other evidence are inconsistent with Dr. Naungayan's opinions as to the extent of plaintiff's limitations. Therefore, it was not inappropriate for the ALJ to decline to assign Dr. Naungayan's opinion's controlling weight. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)).[2]

Plaintiff argues that even if Dr. Naungayan's opinions are not given controlling weight, they should be afforded deference. Doc. #14 at 6. Even if the treating physician's opinion is not given controlling weight, the ALJ must consider a number of factors to determine the proper weight to assign, including "the [l]ength of the treatment relationship and the frequency of

---

[2] As plaintiff suggests, evidence of a claimant's stability in the controlled environment of a doctor's office is not the same as evidence of a claimant's ability in a work environment. *See* Doc. #14 at 4 (citing *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)). Here, however, there was substantial evidence for the ALJ to conclude that plaintiff had significantly improved with treatment as reflected in the treating physician's notes and especially as indicated by the doctor's notes approving plaintiff's efforts to drive and find part-time work. Doc. # 11-8 at 54.

examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . . , particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." *Burgess*, 537 F.3d at 129 (quotation marks omitted); *see generally* 20 C.F.R. § 404.1527(c). After considering these factors, the ALJ is required to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion. . . . Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Burgess*, 537 F.3d at 129–30.

While the ALJ's decision does not expressly state each of the regulatory factors, it is quite evident that the ALJ considered the factors in making his credibility determination. The ALJ discussed how Dr. Naungayan had rendered opinions in October 2013, April 2014, and April 2015. Doc. #11-3 at 48. The ALJ explained that Dr. Naungayan's opinions were contradicted by other medical evidence in the record, including her own notes. This demonstrates that the ALJ was well aware of the tenure of the patient-doctor relationship when he made his credibility determination. Similarly, there is no doubt the ALJ knew Dr. Naungayan specialized in psychiatry given his heavy reliance on her own observations in disregarding her opinion. While the ALJ could have more clearly articulated the relevant factors, the Second Circuit has held that no "slavish recitation of each and every factor" is required "where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). The ALJ did that here. Accordingly, I conclude that the ALJ's credibility determinations with respect to Dr. Naungayan's opinions were supported by substantial evidence.

Next, the ALJ properly weighed the opinion evidence of the non-examining psychological consultants. "State agency . . . psychological consultants are highly qualified and

experts in Social Security disability evaluation." 20 C.F.R. § 416.913a(b)(1). Accordingly, an ALJ may give weight to the medical opinion of such consultants if the opinion is supported by evidence in the record. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012). And the ALJ may determine that the opinion of a treating source should be accorded less weight than a non-examining consultant's opinion, if the opinion of the non-examining source is more consistent with the record as a whole. *See Wright v. Colvin*, 2017 WL 202171, at *6 (D. Conn. 2017). Indeed, as the ALJ noted in his decision, the state agency consultants' opinions as to plaintiff's nonexertional limitations are more consistent with plaintiff's improvement with treatment and the numerous normal MSEs. All in all, I conclude that the ALJ's weighting of the medical opinion evidence was supported by substantial evidence.

### *Credibility Determinations of Plaintiff and his Step-Father*

Plaintiff claims that the ALJ's credibility finding as to plaintiff is not supported by substantial evidence. An ALJ may discredit a plaintiff's subjective assessment of his disability after reviewing medical testimony, plaintiff's demeanor, and other indicia of credibility. *See Tejada v. Apfel*, 167 F.3d 770, 775–76 (2d Cir. 1999). The ALJ is obligated to "assess subjective evidence in light of objective medical facts and diagnoses." *Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988); *see also* 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in [the] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled on the evidence we have.").

The ALJ's credibility assessment declining to credit plaintiff's claim that he could not work is supported by substantial evidence in the record. First, it is supported by the numerous normal MSEs in the longitudinal record. Second, it is supported by the non-examining, state

agency opinions. Third, plaintiff's allegation of inability to work is contradicted, to a degree, by

Dr. Naungayan's statement that plaintiff was well-enough to seek at least part-time work and

drive in January 2014. Doc. # 11-8 at 54. Plaintiff himself indicated he was looking for work in

April 2014. *Id.* at 60.

Plaintiff testified in the hearing that he would be unable to perform work such as picking

up trash in a park, presumably because it is in "town." Doc. #11-3 at 73-74.[3] But in April 2014,

plaintiff was seeking a disability letter so he could have parking at the beach, and he was

"excited about the summer." Doc. #11-8 at 121. This suggests that plaintiff was overstating his

inability to work in "town." All in all, I believe that the ALJ's credibility determination as to

plaintiff's allegation that he could perform no work is supported by substantial evidence.

Plaintiff next argues that the ALJ failed to assess the credibility of plaintiff's step-father.

Doc. #14 at 9 ("[I]t must be noted that the ALJ also failed to make any determination regarding

the credibility of [plaintiff's] step-father who testified at the hearing."). To the contrary, the ALJ

explicitly considered the testimony. The ALJ stated that he "has also considered opinions from

third parties, including [plaintiff's] stepfather (hearing testimony), but has assigned little weight

to these opinions because these third parties did not observe [plaintiff] in a professional capacity

(SSR 06-03p), and because these opinions are not supported by the evidence of record [as]

discussed above." Doc. #11-3 at 48. The ALJ added that "the stepfather's testimony related

primarily to the claimant's initial condition, prior to the treatment and significant improvement

---

[3] It was difficult to discern what plaintiff meant by his response to the question why he cannot perform this kind of work.

     Question (by attorney): What if I find you a job where you could kind of rake a park and pick up trash in a park, just kind of go around, you see something on the ground, you scoop it up? Could you do a park type of job?

     Answer (by plaintiff): No.

     Q: And why not?

     A: Not — not town. Not town.

Doc. #11-3 at 73-74.

indicated by the record and discussed above." *Ibid.* Accordingly, plaintiff's claim that the ALJ

failed to make a credibility determination as to plaintiff's step-father is without merit.

### Reliance on Medical Vocational Guidelines

Plaintiff next claims that the ALJ failed to show at Step Five that a significant number of

jobs exist in the national economy that plaintiff can perform. The Commissioner counters that

the ALJ properly relied upon the Medical Vocational Guidelines ("Grids") to find plaintiff not

disabled. When a claimant's nonexertional limitations "significantly limit the range of work

permitted by his exertional limitations," an ALJ may not rely solely on the Grids at Step Five and

must consult a vocational expert. *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). A

nonexertional impairment "significantly limits" a claimant's range of work when it causes an

"additional loss of work capacity beyond a negligible one or, in other words, one that so narrows

a claimant's possible range of work as to deprive him of a meaningful employment opportunity."

*Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010).

At Step Four, the ALJ concluded plaintiff had an RFC to perform a full range of work at

all exertional levels with some nonexertional limitation: "he could have occasional contact with

supervisors, co-workers, and the public." Doc. #11-3 at 44. The ALJ also noted he could follow

simple instruction and carry out routine tasks. *Ibid.* Other courts have concluded that "a

limitation to occasional interaction does not significantly limit the range of unskilled work, and

reliance on the Grids in such an instance is appropriate." *Goulart v. Colvin*, 2017 WL 253949, at

*5 (D. Conn. 2017); *Brown v. Colvin*, 2016 WL 2944151, at *5 (D. Conn. 2016); *Verret v.

Colvin*, 2016 WL 1182980, at *2 (D. Conn. 2016); *Bombard–Senecal v. Comm'r of Soc. Sec.*,

2014 WL 3778568, at *4 (N.D.N.Y. 2014).

Additionally, the Second Circuit has held that if a claimant's mental condition did not limit the ability to perform unskilled work, including carrying out simple instructions, then that claimant's "nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical-Vocational Guidelines was permissible." *Zabala*, 595 F.3d at 411. Because plaintiff's nonexertional limitations are not significant, the ALJ properly relied on the Grids in determining plaintiff was not disabled.

### *New evidence before the Appeals Council*

Plaintiff claims that remand is required because the Appeals Council did not consider new evidence he presented. The Commissioner argues that the Appeals Council's decision to decline to review the new evidence was proper, because plaintiff did not have good cause for not presenting the evidence to the Appeals Council.

Pursuant to 20 C.F.R. § 405.401(c) (2016),[4] the operative regulation governing reviewability of new evidence before the Appeals Council, the Appeals Council will review new evidence if (1) the evidence relates to the period on or before the hearing decision, (2) there is a "reasonable probability" that the evidence would have changed the ALJ's decision, and (3) either (a) the SSA misled the claimant, (b) some impairment prevented timely submission of the evidence, or (c) some "unusual, unexpected, or unavoidable circumstance beyond [claimant's] control" prevented timely submission. *See generally Orriols v. Colvin*, 2015 WL 5613153, at *3-4 (D. Conn. 2015). The third factor has been called a "good cause" factor. *Id.* at *4.

There are three pieces of new evidence. First, there is a letter from Dr. Naungayan explaining the meaning of her monthly clinical notes. Doc. #11-3 at 9. The letter also states that

---

[4] This provision has been updated and moved and can now be found at 20 C.F.R. §§ 404.970, 416.1470. *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987 (Dec. 16, 2016); *Doyle v. Berryhill*, 2017 WL 2364312, at *4 n.2 (D. Vt. 2017).

the fact plaintiff "is stable now on his current anti-psychotic medication does not preclude him from qualifying for social security benefits, as it would be clear to any clinician who interviewed [him] that he has baseline impairments in his ability to interact and engage with others and in demonstrating core negative symptoms consistent with Schizophrenia that will continue to interfere with his ability to find gainful employment." *Ibid.* She goes on to recommend an independent examination of plaintiff "if there remains a doubt as to [plaintiff's] baseline impairments." *Id.* at 10.

The second piece of evidence consists of a letter and a completed mental impairment questionnaire dated November 2015 from Helene Karlin, Ph.D. The questionnaire form is the same attorney-supplied form that Dr. Naungayan completed in April 2015. The form notes even more symptoms and limitations than noted by Dr. Naungayan in April 2015. *See id.* at 15-17. The last piece of evidence is another letter and mental impairment questionnaire from Dr. Naungayan from September 2015. The questionnaire indicates more limitations than the April 2015 questionnaire did. *See id.* at 28-31.

Plaintiff argues "good cause" exists for not timely furnishing this evidence because "Dr. Naungayan was unable to address the ALJ's concerns about the contents of her treatment records as the ALJ never made this concern known to the doctor or to [plaintiff's counsel] and Dr. Karlin had not yet evaluated the claimant at the time of the ALJ's decision." Doc. #14 at 12.[5] I think the implications of plaintiff's argument are troubling. In essence, plaintiff argues there is good cause simply because the record before the ALJ did not persuade him that plaintiff was disabled.

Plaintiff argues that the "good cause" in this case is similar to the "good cause" found by Judge Underhill in *Orriols*. I do not agree. In that case, a surgery that occurred after a claimant's

_____

[5] Plaintiff does not argue that the ALJ failed to develop the record.

14

hearing revealed more extensive impairment than originally thought, and there was no indication that any of the claimant's physicians were aware of the evidence revealed by the surgery. *Orriols*, 2015 WL 5613153, at *5. In this case, there is no indication that any of the newly supplied evidence reveals anything that Dr. Naungayan did not already know before the ALJ decision was rendered. Additionally, nothing prevented plaintiff from getting an independent examination from another doctor before the ALJ hearing.

The parties do not contest that the evidence relates to the relevant time period, *i.e.*, the first factor. The parties do contest the second factor, whether there was a reasonable probability that the evidence would have changed the ALJ's decision. It is doubtful this evidence would have persuaded the ALJ, because the evidence is from 2015 and has an attenuated bearing upon whether plaintiff could have returned to work within 12 months of his date of last insured—June 30, 2013. And because plaintiff has not shown "good cause" for failing to timely provide this evidence to the ALJ in the first place, a remand is not warranted.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings (Doc. #13) is DENIED. The Commissioner's motion to affirm the decision of the Commissioner (Doc. #23) is GRANTED.

It is so ordered.

Dated at New Haven this 31st day of March 2018.

*/s/ Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge